UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CARL GOODWIN,

        Plaintiff,

        -against-

MTA BUS COMPANY,

        Defendant.
-----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
14-CV-4775 (RRM) (JO)

ROSLYNN R. MAUSKOPF, United States District Judge.

On August 12, 2014, plaintiff Carl Goodwin commenced this action against defendant MTA Bus Company ("MTA") for discriminating against him in contravention of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, New York State's Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and New York City's Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-107. (*See generally* Compl. (Doc. No. 1). Specifically, Goodwin alleges that MTA fired him after he was diagnosed with deep vein thrombosis ("DVT"), rather than accommodating him through either a leave of absence or reassignment to a different position. (*Id.*) On July 29, 2016, MTA moved for summary judgment. (Def. Mot. (Doc. No 58).) For the reasons set forth herein, MTA's motion for summary judgment is granted, and Goodwin's case is dismissed.

## BACKGROUND

### I. Facts

The following facts are not in dispute. Goodwin worked as a part-time probationary bus operator for MTA from October, 2012 to April, 2013, assigned to the Spring Creek Bus Depot. (Rule 56.1 Statement (Doc. No. 61) at ¶ 24.) Had Goodwin completed a full year of employment, he would have earned approximately $28,000, not including overtime. (*Id.* at ¶ 25–

26.) However, approximately six months into his probationary period, on April 27, 2013, Goodwin began experiencing swelling and soreness in his right leg. (*Id.* at ¶ 28.) Goodwin's doctor sent him for an MRI, which revealed blood clots in his right leg. (*Id.* at ¶ 30.) On April 28, 2013, Goodwin was taken by ambulance to the hospital where he remained for four days. (*Id.* at ¶ 31.) Goodwin never returned to work in any capacity. (Id. at ¶ 44.)

Prior to his discharge from the hospital on May 3, 2013, Goodwin was diagnosed with DVT in his right leg. (*Id.* at ¶¶ 32–34.) DVT is a circulatory disorder characterized by the occurrence of deep vein blood clots, which cause pain and swelling. (*Id.* at ¶ 30.) The blood clots associated with DVT can "break off and travel through the bloodstream…and cause a pulmonary embolism." (Compl. at ¶ 11; Def. Mot. at 14.) To alleviate these symptoms, Goodwin was prescribed an anticoagulant medication. (Rule 56.1 Statement at ¶ 36.) However, this treatment brings its own risk factors, such as uncontrolled bleeding should the patient be cut. (Ex. C. to the Ferrier Decl. (Doc. No. 58-6) at 38.)

On May 13, 2013, at the request of MTA, Goodwin was evaluated by a doctor at the Medical Assessment Centers ("MAC"). (Rule 56.1 Statement at ¶ 35.) MTA's doctor assessed Goodwin as permanently restricted from operating any transit vehicle. (Def. Mot. Ex. C to the Ferrier Dec. at 43–44) Goodwin revisited the MAC on May 31, 2013, and was again found permanently restricted from operating any transit vehicle because he was still on anticoagulant medication. (Rule 56.1 Statement at ¶ 43.)

On June 3, 2013, Goodwin was called into a meeting with a Union representative and Rekha Morris, the General Superintendent for Support Services for Spring Creek. (*Id.* at 51.) Ms. Morris explained to Goodwin that he had been medically disqualified from driving a bus,

and therefore he could resign or be terminated. (*Id.* at ¶ 52.) Goodwin refused to resign, and MTA terminated his employment. (Def. Mot. at 5; Pl. Mot. (Doc. No. 59) at 5.)

II. **Procedural History**

After MTA terminated his employment, Goodwin filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Compl. at ¶ 5.) On February 10, 2014, the EEOC issued a determination on the merits finding that MTA discriminated against Goodwin by failing to provide a reasonable job accommodation, and retaliated against Goodwin for seeking an accommodation. (Final Determination (Doc. No. 59-5).) On July 1, 2014, the EEOC issued Goodwin a Dismissal and Notice of Right to Sue within 90 days. (Dismissal and Notice (Doc. No. 59-2).) On August 12, 2014, Goodwin commenced this action, and on July 29, 2016, MTA moved for summary judgment. (*See generally* Compl.; Def. Mot.)[1]

STANDARD OF REVIEW

In the summary judgment context, the Court must construe evidence in the light most favorable to Goodwin, the non-movant. *See, e.g., Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001). Summary judgment is appropriate only where there exists no genuine issue of material fact. Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir.

---

[1] Separately, Goodwin moves pursuant to Federal Rule of Civil Procedure 72(a), (Doc. No. 56), objecting to Magistrate Judge Orenstein's order denying Goodwin's request to re-open discovery. (*See* Tr. of 6/8/2016 Proceedings (Doc. No. 55) at 3, 8; 6/8/2016 Min. Entry (Doc. No. 47).) Under Rule 72(a), when a magistrate judge rules on a non-dispositive matter, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed .R. Civ. P. 72(a). Where, as here, the Court has entered a scheduling order pursuant to Rule 16(b) of the Federal Rules of Civil Procedure, the court-ordered schedule "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). A party requesting to reopen discovery bears the burden of establishing good cause. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). In this case, Goodwin seeks to reopen discovery over seven months after the close of discovery and five months after MTA served its motion for summary judgment. In his objection, Goodwin raises the same arguments that he presented to Judge Orenstein, specifically that the Court should "right a wrong resulting from [Goodwin's] former counsel's incompetence." (Pl.'s 6/23/16 Ltr. (Doc. No. 56) at 1.) Generally, the inadvertent failures of a former or current attorney do not constitute sufficient good cause. *See Scott v. N.Y. City Dep't of Correction*, 445 F. App'x 389, 391 (2d Cir. 2011). Accordingly, Judge Orenstein did not abuse his discretion, and the Court affirms his decision that the alleged negligence of Goodwin's former counsel was not sufficient to establish good cause for reopening discovery. (*See* Tr. of 6/8/16 Proceedings at 9–18.)

2013); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The moving party, MTA, bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Upon such showing, the burden shifts to Goodwin to present evidence sufficient to satisfy every element of the claim. *Id.* In so doing, Goodwin is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. In assessing the record to determine whether there is a genuine issue of material fact to be tried, the Court is required to resolve all ambiguities and draw all permissible factual inferences in Goodwin's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

## DISCUSSION

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the instant case, Goodwin brings the following claims under the ADA: failure to reasonably accommodate his disability, terminating him based on his disability, and retaliation for requesting an accommodation. (*See* Compl. at ¶¶ 46, 50, 56.)

I. **"Otherwise Qualified" Under the ADA**

Claims under the ADA are governed by the test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) (the "*McDonnell Douglas* test"). Under the burden-shifting *McDonnell Douglas* test, first, a plaintiff must establish a *prima facie* case of discrimination; second, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; and third, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were a pretext for discrimination. *See Brady v. Wal-Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir. 2008).

Both Goodwin's discriminatory termination and failure to accommodate ADA claims require him to make a prima facie case of discrimination under the *McDonnell Douglas* test. *See, e.g., Brady,* 531 F.3d at 134; *McDonald v. City of New York & N.Y. City Dep't of Transportation,* 786 F. Supp. 2d 588, 614 (E.D.N.Y. 2011). In order to establish a *prima facie* case, a plaintiff must show, by a preponderance of the evidence: (1) that his employer is subject to the ADA; (2) that he suffers from a disability within the meaning of the ADA or is perceived to be so by his employer; (3) that he was otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (4) that he suffered an adverse employment action because of his disability. *See Brady,* 531 F.3d at 134 (2d Cir. 2008).

MTA argues that Goodwin fails to demonstrate either that DVT is a cognizable disability under the ADA, or that he was "otherwise qualified to perform the essential functions of his job with or without reasonable accommodation." *Brady,* 531 F.3d at 134 (2d Cir. 2008). Even assuming that DVT constitutes a disability under the ADA, Goodwin has failed to demonstrate that he was otherwise qualified to perform the essential function of a bus operator.

In order to demonstrate that he was otherwise qualified to be a bus operator, Goodwin must show that he "is able to perform the essential functions of that job, either with or without a reasonable accommodation." *Borkowski v. Valley Central Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995); *accord* 42 U.S.C. § 12111(8); *McBride*, 583 F.3d at 96 ("[A] qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.") However, a "reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003). EEOC regulations define "essential functions" to mean the "'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1) (1996)); *see also Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 127–128 (E.D.N.Y. 2014). In making this determination, "[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998) (citing *Doe v. New York Univ.*, 666 F.2d 761, 776 (2d Cir. 1981)). For purposes of this inquiry, courts must first determine "whether the employer actually required employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. pt. 1630 app. § 1630.2(n). If so, "the inquiry will then center around whether removing the function would fundamentally alter that position." *Id.*; *accord Shannon*, 332 F.3d at 101.

### A. The Effects of DVT and Anticoagulant Therapy

There is no dispute that Goodwin suffered from DVT at the time that MTA terminated his employment. (Rule 56.1 Statement. at ¶¶ 32–34.) DVT affects the circulatory system, and

causes deep vein blood clots, which cause pain and swelling. (*Id.* at ¶ 30.) These blood clots can "break off and travel through the bloodstream . . . and cause a pulmonary embolism." (Compl. at ¶ 11; Def. Mot. at 14.) There is also no dispute that Goodwin was taking prescription anticoagulant medication at the time that MTA terminated his employment. (Rule 56.1 Statement at ¶ 36.) However, with this treatment comes an elevated risk of stroke and brain hemorrhage, as well as uncontrolled bleeding if cut. (Ex. C. to the Ferrier Decl. (Doc. No. 58-6) at 38; Dr. Lim Decl. (Doc. No. 58-26) at 11.) Thus, at the time of his termination, Goodwin presented with serious medical risks both with and without anticoagulant therapy.

### B. The Duties of the Bus Operator Position and MTA Medical Standards

Goodwin does not dispute that his responsibilities as a bus operator included, *inter alia*, driving, cleaning and inspecting the bus, moving equipment, and filling out paperwork. (Ex. C. to the Ferrier Decl. at 25.) In determining whether a claimant is qualified to perform a job's essential functions, "[c]ourts must consider an employer's description of a job's essential functions, including pertinent medical standards." *Shannon*, 332 F.3d at 100; *see* 42 U.S.C. §§ 12111(8), 12113(a). Notably, under Article 19-A of the New York State Vehicle and Traffic Law (the "VTL"), MTA has legal obligations as a provider of public transportation to certify its bus operators as medically qualified to drive a bus. *See* N.Y. Veh. & Traf. Law. § 509; *Siederbaum v. City of New York*, 309 F. Supp. 2d 618, 621 (S.D.N.Y. 2004), *aff'd*, 121 F. App'x. 435 (2d Cir. 2005). The VTL requires MTA to conduct periodic medical examinations of bus operators. *See* N.Y. Veh. & Traf. Law. § 509(g)(l). Regulations promulgated pursuant to the VTL set forth certain physical and medical requirements as "Special Requirements for Drivers." *See generally* 15 NYCRR § 6.1. Those regulations require MTA to certify that its bus operators are "physically qualified to drive a bus." *Id.* at § 6.10 (a), (b)(1). For example, the MTA must

certify that the prospective bus operator has "no current clinical diagnosis of . . . thrombosis." *Id.* at § 6.10 (b)(3). Here, Goodwin does not dispute that his impairment, thrombosis, was specifically listed as a legally disqualifying medical condition for drivers. 15 NYCRR at § 6.10 (b)(3).

### C. The Risks Posed by a Bus Operator with DVT

Goodwin also does not dispute the risks associated with operating a bus on anticoagulant medication. "It is self-evident that the bus operator position is extremely safety sensitive." *Burton*, 244 F. Supp. 2d at 262. Furthermore, it is uncontroverted that the bus operator's responsibilities include "hours a day of public contact with combative and sometimes violent passengers who occasionally inflict bodily harm on the bus operators; working around sharp objects both on the bus (for example, wheelchair lift mechanisms) and in the depots; the necessity of walking on slippery surfaces, both in the depot and in public places; and of course the especial danger posed by the frequency of even relatively minor motor vehicle accidents." (Dr. Lim Decl. at 11.) With that in mind, MTA medical regulations were "directed to the safety of the driver" and "unreasonable risk to the public." *Burton*, 244 F. Supp. 2d at 262.

Here, there is no dispute that a driver on anticoagulant medication would be at heightened risk of both uncontrolled bleeding and stroke. (Ex. C. to the Ferrier Decl. at 38; Dr. Lim Decl. at 11.) Thus, the "indirect risk" of minor injury resulting in bleeding, "coupled with the additional, more obvious risk that a bus operator taking [anticoagulant medication] could suffer a stroke . . . is unacceptable, and therefore appropriately disqualifying." *Burton*, 244 F. Supp. 2d at 262. Therefore, based on the undisputed evidence in the record, driving a bus is an essential function of being a bus operator, and Goodwin was not qualified to drive a bus. *See, e.g., Burton*, 244 F. Supp. 2d at 259; *Shannon*, 332 F.3d at 103. Given that a "reasonable accommodation can never

involve the elimination of an essential function of a job," Goodwin cannot show that he "is able to perform the essential functions of [bus operator] either with or without a reasonable accommodation." *Shannon*, 332 F.3d at 100; *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 261 (E.D.N.Y. 2015)("While a reasonable accommodation may include adjustments such as the modification of physical facilities, work schedules or equipment or job restructuring, reasonable accommodation does not mean the elimination of any of the position's essential functions.")

### D. Reassignment or Leave of Absence as Reasonable Accommodation

As noted above, Goodwin does not dispute that thrombosis was specifically listed as a legally disqualifying medical condition for drivers, nor does he dispute the public safety risk of allowing a person with DVT to operate a public bus. Rather, Goodwin argues that it would have been a reasonable accommodation to adjust his duties to "light work" for the pendency of his anticoagulant regimen. (See Pl. Mot. at 16.) Goodwin asserts that there was a "restricted duty" job to which he could have been reassigned that consisted of carrying things around the depot, delivering things to other depots, "run[ning] errands," or "maybe filling out some forms." (Rule 56.1 Statement at ¶ 60.) However, as noted above, a reasonable accommodation can never involve eliminating a job's essential functions. *See, e.g., McBride*, 583 F.3d at 96. As such, the ADA did not require the MTA to accommodate Goodwin with a non-driving position. *See Shannon*, 332 F.3d at 104 ("Reassignment to a vacant position can be a reasonable accommodation in certain circumstances. Nevertheless, it is not at all clear that the ADA requires reassignment to another job altogether, rather than to a vacant position doing the same job . . . .") (internal citations and quotation marks omitted).

9

Goodwin also argues that he was entitled to the reasonable accommodation of a leave of absence. (Pl. Mot. At 7.) Specifically, Goodwin argues that the word "current" in 15 NYCRR § 6.10 (a bus driver must have "no current clinical diagnosis of . . . thrombosis"), requires allowing "someone who suffers from thrombosis to recover and resume their duties." (Pl. Mot. at 8.) This argument, too, is unavailing.

Goodwin took prescription anticoagulant medication for approximately six months after MTA terminated his employment. (Rule 56.1 Statement at ¶ 83.) Subsequently, he began taking a daily dose of baby aspirin for its anticoagulant purposes. (*Id.* at ¶ 84.) On that basis, Goodwin argues that an "obvious reasonable accommodation would have been for plaintiff to continue to be on leave until such time as his DVT had potentially been resolved in six months." (Pl. Mot. at 8.) The Second Circuit has not resolved "whether paid or unpaid leave can constitute a reasonable accommodation under the ADA." *Petrone v. Hampton Bays Union Free Sch. Dist.*, 568 F. App'x 5, 8 n.2 (2d Cir. 2014) (citing *Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 560 (2d Cir. 2009)). However, even assuming that a leave of absence can constitute a reasonable accommodation, that accommodation ultimately "must enable the employee to perform the essential functions of his job." *Petrone*, 568 F. App'x at 8 n.2; *accord McMillan*, 711 F.3d at 127 ("After the essential functions of the position are determined, plaintiff must demonstrate that he or she could have performed these functions, with or without reasonable accommodation, *at the time of the termination . . . .*") (emphasis added).

Here, months after MTA terminated Goodwin's employment and after he had switched from prescription anticoagulants to aspirin, Goodwin's own hematologist, Alexander Losev, wrote: "In general patient has no contraindication to come back to his work. However, I told him that working as a bus driver might be a risk factor for developing another blood clot since he

spends most of his time immobile driving the bus." (Ex. F. to the Ferrier Decl. (Doc. No. 58-9) at 2.) In other words, there was no indication that Goodwin could perform the essential functions of bus operator months after he was terminated – let alone at the time – due to the risks presented by his medical condition. *McMillan*, 711 F.3d at 127; *Petrone*, 568 F. App'x at 8 ("[Plaintiff] never met his initial burden to show that the accommodation was reasonable—that is, that it would have allowed him to return to work."). Regardless, Goodwin did not request a leave of absence in lieu of termination – he requested reassignment. (Rule 56.1 Statement at ¶ 54); *see Graves*, 457 F.3d at 184 ("[G]enerally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." (internal quotation marks omitted)); *Graham v. Macy's Inc.*, 2017 U.S. App. LEXIS 1687, at *2 (2d Cir. 2017). As such, based on the uncontroverted evidence in the record, Goodwin was entitled to neither reassignment, nor a leave of absence as a reasonable accommodation under the ADA.

## II. Retaliation and the Interactive Process

Goodwin also fails to establish a prima facie case of retaliation. To establish a prima facie case of retaliation under the ADA, a plaintiff must show: "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of the activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *McDonald*, 786 F. Supp. 2d at 613. Here, MTA's termination of Goodwin's employment occurred prior to Goodwin's filing charges with the EEOC. (Rule 56.1 Statement at ¶¶ 51–54; 56; EEOC Final Determination); *see McDonald*, 786 F. Supp. 2d 588 at 614 ("Thus, the primary adverse employment action here . . . was taken well prior to plaintiff's discrimination charge.") As such, Goodwin fails to establish a prima facie case of retaliation under the ADA.

Having failed to make a prima facie case of discrimination under the ADA, each of Goodwin's ADA claims fail. *See, e.g., McDonnell v. Schindler Elevator Corp.*, 618 F. App'x 697, 698 (2d Cir. 2015) (finding that failure under one prong under the *McDonnell Douglas* test constitutes failure of a prima facie claim of discrimination). To the extent that Goodwin attempts to plead an independent cause of action for "failure to engage in the administrative process," (Pl. Mot. at 13–15) that claim also fails, because Goodwin cannot establish that he was qualified for his position. *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 99–101 (2d Cir. 2009) (collecting cases) ("[A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue."). There being no genuine issues of material fact, the Court grants MTA summary judgment on each of Goodwin's ADA claims.

### III. Goodwin's Claims under State and City Analogues to the ADA

Having dismissed each of Goodwin's federal claims, the Court declines to exercise supplemental jurisdiction over his city and state law claims brought pursuant to NYSHRL and NYCHRL. *See Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("'[Declining] to exercise supplemental jurisdiction'" over state law claims because the court "'has dismissed all claims over which it has original jurisdiction'") (quoting 28 U.S.C. § 1367(c)(3)); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("Having determined that the federal claims against defendants do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted."); *Sykes v. North Fork Bank*, No. 07-CV-1102 (FB), 2009 U.S. Dist. LEXIS 117311, *4–5 (E.D.N.Y. 2009) (dismissing ADA complaint and declining to exercise supplemental jurisdiction over state law

claims); *Tillman v. Verizon NY., Inc.*, No. 13-CV-4386 (ADS), 2015 U.S. Dist. LEXIS 99688, *66 (E.D.N.Y. July 30, 2015) (declining to exercise supplement jurisdiction over plaintiff's NYSHRL and NYCHRL claims after disposing of ADA claims). Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), Goodwin's remaining city and state law claims are dismissed.

## CONCLUSION

For the reasons stated herein, MTA's motion for summary judgment (Doc. No. 58) is granted. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: Brooklyn, New York
March 27, 2017

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge